# UNITED STATES DISTRICT COURT

## DISTRICT OF DELAWARE

| | |
|---|---|
| TIMOTHY ROONEY, Individually And On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> WILMINGTON TRUST CORPORATION, TED T. CECALA, DONALD E. FOLEY, DAVID REED GIBSON and ROBERT V.A. HARRA, JR., <br><br> Defendants | CIVIL ACTION NO. _____ <br><br> **CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS** <br><br><br> <u>**JURY TRIAL DEMANDED**</u> |

## INTRODUCTION

1.      This is a federal class action on behalf of purchasers of the common stock of Wilmington Trust Corporation ("Wilmington Trust" or the "Company") between **October 23, 2009, and November 1, 2010,** inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").   As alleged herein, defendants published a series of materially false and misleading statements that defendants knew and/or recklessly disregarded were materially false and misleading at the time of such publication, and that omitted to reveal material information necessary to make defendants' statements, in light of such material omissions, not materially false and misleading.

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the United States Securities and Exchange Commission ("SEC") [17 C.F.R. § 240.10b-5].

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

4.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).   Wilmington Trust maintains its principal place of business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

5.      In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

6.      Plaintiff **TIMOTHY ROONEY**, as set forth in the accompanying certification, incorporated by reference herein, purchased the common stock of Wilmington Trust at artificially inflated prices during the Class Period and has been damaged thereby.

7.      Defendant **WILMINGTON TRUST CORPORATION** ("Wilmington Trust" or "Company") is organized under the laws of the state of Delaware and maintains its principal place of business at 1100 North Market Street, Rodney Square North, Wilmington, DE 19890-0001. According to the Company's press releases, published on *BusinessWire*, Wilmington Trust Corp. is a financial services holding company that provides Regional Banking services

2

throughout the mid-Atlantic region, Wealth Advisory services to high-net-worth clients in 36 countries, and Corporate Client services to institutional clients in 89 countries. Its wholly-owned bank subsidiary, Wilmington Trust Company, which was founded in 1903, is one of the largest personal trust providers in the United States and the leading retail and commercial bank in Delaware. Wilmington Trust Corporation and its affiliates have offices in Arizona, California, Connecticut, Delaware, Florida, Georgia, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New York, Pennsylvania, South Carolina, Vermont, the Cayman Islands, the Channel Islands, London, Dublin, Frankfurt, Luxembourg, and Amsterdam.

8.     Defendant **TED T. CECALA** ("Cecala") was, during the Class Period and until his departure from the Company on or about June 3, 2010, Chairman of the Board of Directors and Chief Executive Officer of the Company. During the Class Period, defendant Cecala signed and certified the Company's quarterly SEC filings, and assisted in the preparation and/or signed the Registration Statement filed in connection with the February 23, 2010 registration and sale of over $287.6 million of Company stock

9.     Defendant **DONALD E. FOLEY** ("Foley") is, and during the Class Period was, Chairman of the Board of Directors, Chief Executive Officer and Chairman of Audit Committee and Member of Compensation Committee of the Board of Directors of the Company. During the Class Period, defendant Foley signed and certified the Company's quarterly SEC filings.

10.    Defendant **DAVID REED GIBSON** ("Gibson") is, and during the Class Period was, Chief Financial Officer, Executive Vice President of the Company, as well as Chief Financial Officer of Wilmington Trust Company and Executive Vice President of Wilmington Trust Company. During the Class Period, defendant Gibson signed and certified the Company's quarterly SEC filings, and assisted in the preparation and/or signed the Registration Statement

3

filed in connection with the February 23, 2010 registration and sale of over $287.6 million of Company stock.

11.     Defendant **ROBERT V.A. HARRA, JR.,** ("Harra") is, and during the Class Period was, President and Chief Operating Officer of the Company.  During the Class Period, defendant Harra assisted in the preparation and filing of the Company's quarterly SEC filings, and assisted in the preparation and/or signed the Registration Statement filed in connection with the February 23, 2010 registration and sale of over $287.6 million of Company stock.

12.     The defendants referenced above in ¶¶8-11 are referred to herein as the "Individual Defendants."

13.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Wilmington Trust's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false and misleading statements pleaded herein.

14.     Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Wilmington Trust common stock by disseminating materially false and misleading statements and/or concealing material adverse

4

facts. The scheme: (a) deceived the investing public regarding Wilmington Trust's business, operations, management and the intrinsic value of Wilmington Trust common stock; (b) enabled defendants to artificially inflate the price of Wilmington Trust shares; (c) enabled defendants to sell over $287.6 million of Wilmington Trust common stock to the public while in possession of material adverse non-public information about the Company; and (d) caused plaintiff and other members of the Class to purchase Wilmington Trust common stock at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

15. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the common stock of Wilmington Trust between **October 23, 2009, and November 1, 2010,** inclusive (the "Class") and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

16. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Wilmington Trust common shares were actively traded on the New York Stock Exchange (NYSE). As of May 5, 2010, the Company had over 91.197 million shares of common stock issued and outstanding. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Wilmington Trust or its transfer agent and may be notified of the pendency of this

action by mail, using the form of notice similar to that customarily used in securities class actions.

17.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

18.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

19.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Wilmington Trust; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

20.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

6

## SUBSTANTIVE ALLEGATIONS

### Defendants' Materially False and Misleading
### Statements Made During the Class Period

21. On October 23, 2009, the inception of the Class Period, defendants published a

release announcing purported results for the third quarter of 2009, the period ended September

30, 2009. This release stated, in part, the following:

WILMINGTON TRUST ANNOUNCES 2009 THIRD QUARTER RESULTS

Wilmington, Del., October 23, 2009 – Wilmington Trust Corporation (NYSE: WL) reported a loss of $5.9 million, or $0.15 per diluted common share, for the third quarter of 2009. Earnings for the quarter were offset by $38.1 million of losses on securities in the company's investment portfolio. On an aftertax basis, these securities losses reduced net income by approximately $23.6 million and earnings by approximately $0.34 per diluted common share.

"The Corporate Client Services business recorded impressive revenue growth, the provision for loan losses declined, the net interest margin improved, and there were numerous other positive developments during the third quarter," said Ted T. Cecala, Wilmington Trust chairman and chief executive officer. "Unfortunately, recessionary pressures reduced the value of some of our investment securities and triggered accounting rules that require us to write them down."

The company's capital position remained strong. All regulatory capital ratios improved from their 2009 second quarter levels, and all continued to exceed the amounts required by the Federal Reserve Board to be considered well capitalized, both including and excluding the $330 million in Capital Purchase Program funds the company received in December 2008 in exchange for issuing shares of Wilmington Trust Series A preferred stock to the U.S. Department of the Treasury.

Positive aspects of third quarter results included:

*      Growth in Corporate Client Services (CCS) revenue, which rose to $43.9 million. This was 28% higher than for the year-ago third quarter, and 6% higher than for the trailing (2009 second) quarter. The year-over-year growth was due mainly to the large retirement services acquisitions completed in 2008. The trailing quarter increase was due mainly to growing demand for default and bankruptcy administration services and successor loan agency services. CCS is providing successor trustee or other services for most of the largest bankruptcies filed over the past 12 months, including the General Motors bankruptcy.

\* A trailing-quarter decline in the provision for loan losses. The provision was $38.7 million, which was 28% lower than for the 2009 second quarter. Credit quality is discussed in more detail elsewhere in this release.

\* A higher net interest margin. The margin rose to 3.23%, which was 7 basis points higher than for the trailing quarter, as core and non-core funding costs decreased.

\* A $96.7 million trailing-quarter increase in core deposits, on average, which rose to $6.70 billion. The increase in core deposits reduced the need for non-core funding, which contributed to the decrease in funding costs.

Disciplined expense management. Noninterest expenses were slightly lower than for the trailing quarter, and 3% higher than for the year-ago third quarter. Two items accounted for most of the year-over-year increase:

\*   \*   \*

Total loan balances for the 2009 third quarter were $9.08 billion, on average.

\*   \*   \*

The increase in commercial mortgage balances reflected changes in the credit markets that have minimized the competitive advantages formerly held by specialty commercial mortgage lenders. Wilmington Trust extends commercial mortgage loans to middle-market business owners (privately held and family-owned businesses with up to $250 million of annual sales) within the mid-Atlantic region. In general, the company does not extend credit for high-rise office building projects.

More than half of commercial mortgage loans at September 30, 2009, were for owner-occupied properties. Approximately 18% were for community shopping centers. The rest were for a variety of other types of commercial and industrial properties. Approximately 57% of commercial mortgage loans were for properties in Delaware, with the majority in the state's northern-most county.

Revenue from the advisory businesses – CCS, Wealth Advisory Services (WAS), and the affiliate money managers – totaled $92.4 million (after amortization), which exceeded net interest income (before the provision for loan losses) by $12.4 million.

WAS business development remained solid in the third quarter, but WAS revenue declined, mainly due to:

\* Client preference for cash management and fixed income investments. Although equity markets improved during the third quarter, most WAS

8

clients opted for investments with less volatility. This dampened revenue because, in general, the company's pricing is lower for cash management and fixed income investment services than for other types of investment management services.

\* The decline in mutual fund yields due to the low market interest rate environment. Because these yields are so low, the company has waived its management fees. These waivers reduced WAS revenue for the 2009 third quarter by approximately $3 million.

22.    Regarding the purported performance of the Company's credit quality, the

October 23, 2009 release stated, in part, the following:

Credit quality

Approximately 87% of total loans outstanding at September 30, 2009, were to clients in Delaware, southeastern Pennsylvania, and Maryland, where the economic downturn has not been as severe as in some other parts of the United States. According to the October 2009 Business Outlook Survey published by the Federal Reserve Bank of Philadelphia, trends suggest economic declines in the region have moderated.

These conditions produced mixed credit quality metrics. Compared to the 2009 second quarter, the provision for loan losses as well as net charge-offs and the net charge-off ratio were lower, while nonperforming assets and loans past due 90 days or more were higher.

The provision for loan losses was $38.7 million, which was 28% lower than the $54.0 million recorded for the 2009 second quarter. The reserve for loan losses was $201.8 million, up 9% from $184.9 million at June 30, 2009. The higher reserve reflected additional downgrades in the internal risk rating analysis, plus the increases in nonperforming assets and loans past due 90 days or more.

At September 30, 2009, the loan loss reserve ratio was 2.24%, and the nonperforming asset ratio was 4.39%. The reserve ratio differs from the nonperforming asset ratio because an asset's nonperformance does not automatically lead to a partial or total loss.

The amount of the reserve reflects management's estimates of probable losses. Those estimates are based on a combination of past loss experience, qualitative adjustments to capture current trends, and actual collateral measurements. The process management uses to calculate the reserve follows specific regulatory requirements and accounting rules.

"We prefer to work with borrowers to resolve repayment problems instead of automatically charging off unpaid amounts. Consequently, loans may remain on nonaccruing status for longer periods," Mr. Cecala said. "Compared to many other banks, our nonperforming asset levels are typically higher, but our net charge-offs are typically lower. We believe the net charge-off ratio is the most meaningful measure of credit quality, and we believe our loan loss reserve is adequate."

Net charge-offs for the 2009 third quarter were $21.8 million, which was 40% less than the $36.2 million recorded for the 2009 second quarter. The net charge-off ratio was 0.24% of total loans outstanding. This was 15 basis points lower than the 0.39% recorded for the 2009 second quarter. On an annualized basis, the net charge-off ratio decreased to 0.96%. This was 60 basis points lower than for the 2009 second quarter, when the annualized net charge-off ratio was 1.56%.

Nonperforming assets totaled $397.5 million, which was $67.2 million higher than at the end of the 2009 second quarter. Commercial construction loans for residential projects in Delaware and Pennsylvania accounted for two-thirds, or $45.4 million, of this increase.

Loans past due 90 days or more were $38.7 million, which was $12.0 million higher than at the end of the 2009 second quarter. Commercial mortgage and consumer loans accounted for nearly all of this increase.

The financial statement section of this release contains additional disclosures about credit quality.

23.     Regarding the purported performance of the Company's investment securities

portfolio, the October 23, 2009 release stated, in part, the following:

Investment securities portfolio

Investment securities balances totaled $608.7 million at September 30, 2009, down 15% from the end of the 2009 second quarter. The change in balances was due primarily to:

*       Maturities of mortgage-backed, U.S. Treasury, and other government agency securities.

*       Write-downs on securities that were determined to be other-than-temporarily impaired (OTTI) under U.S. generally accepted accounting principles.

In the 2009 third quarter, the company recorded $38.1 million of securities losses and $1.5 million of securities gains.

Almost all of the securities losses in the 2009 third quarter were associated with pooled trust-preferred securities (TruPS), which consist of securities issued by banks, insurance companies, and other financial institutions. The inability of some of the underlying issuers to meet associated cash flow obligations, plus lack of trading activity, continued to reduce the value of these TruPS and render them OTTI.

24.     As shares of Wilmington Trust continued to trade at artificially inflated levels, on November 9, 2009, defendants filed with the SEC the Company's 3Q:09 Form 10-Q, for the second quarter ended September 30, 2009, signed and certified by defendants Foley and Gibson. In addition to making substantially similar statements concerning the Company operations, including expenses, costs and ratios, as had been published previously, the 3Q:09 Form 10-Q also provided statements concerning the Company's controls and procedures, as follows:

**ITEM 4. CONTROLS AND PROCEDURES**

Our chairman and chief executive officer, as well as our chief financial officer, evaluated the effectiveness of our disclosure controls and procedures as of September 30, 2009, pursuant to Securities Exchange Act Rule 13a-15(e). Based on that evaluation, they concluded that our disclosure controls and procedures were effective in alerting them on a timely basis to any material information about our company (including our consolidated subsidiaries) that we are required to include in the periodic filings we make with the Securities and Exchange Commission. There was no change in our internal control over financial reporting during the third quarter of 2009 that materially affected, or is reasonably likely to have a material effect on, our internal control over financial reporting.

25.     In addition to the foregoing, the Company's 3Q:09 Form 10-Q also contained certifications by defendants Foley and Gibson that attested to the purported accuracy and completeness of the Company's financial and operational reports, as follows:

SECTION 1350 CERTIFICATIONS
PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

The undersigned certify that, to their knowledge, the Form 10-Q of Wilmington Trust Corporation (the Corporation) for the third quarter of 2009 fully complies with the requirements of section 13(a) of the Securities Exchange Act of 1934 and

that the information contained in that report fairly presents, in all material respects, the financial condition and results of operation of the Corporation.

/s/ Donald E. Foley
Donald E. Foley
Chairman of the Board and Chief Executive Officer

/s/ David R. Gibson
David R. Gibson
Executive Vice President and Chief Financial Officer

26.    The statements made by defendants and contained in the Company's October 23, 2009 release and in the Company's 3Q:09 Form 10-Q were each materially false and misleading when made, and were known by defendants to be false or were recklessly disregarded as such thereby, for the following reasons, among others:

(a)    At all times during the Class Period, it was not true that the Company's purported success was the result of defendants' competent management when, in fact, throughout the Class Period, defendants had propped up the Company's results by manipulating Wilmington Trust's accounting for revenues and income and by failing to adequately write down the value of its impaired loan portfolios;

(b)    At all times during the Class Period, unbeknownst to investors, defendants had materially overstated the Company's profitability by failing to properly account for the Company's results of operations and by artificially inflating the Company's financial results, and by failing to properly account for and write down the value of its materially impaired real estate loan portfolio;

(c)    Throughout the Class Period, it was also not true that Wilmington Trust contained adequate systems of internal operational or financial controls, such that Wilmington Trust's reported financial statements were true, accurate or reliable;

12

(d)     As a result of the foregoing, throughout the Class Period it also was not true that the Company's financial statements and reports were prepared in accordance with GAAP ad SEC rules; and

(e)     As a result of the aforementioned adverse conditions which defendants failed to disclose, throughout the Class Period, defendants lacked any reasonable basis to claim that Wilmington Trust was operating according to plan, or that Wilmington Trust could achieve guidance sponsored and/or endorsed by defendants.

27.     On January 29, 2010, defendants published a release announcing purported results for the fourth quarter and year end 2009, the period ended December 31, 2009. This release also stated, in part, the following:

WILMINGTON TRUST ANNOUNCES 2009 FOURTH QUARTER RESULTS

Wilmington, Del., January 29, 2010 – Wilmington Trust Corporation (NYSE: WL) reported a loss of $11.2 million for the 2009 fourth quarter and a loss of $4.4 million for the 2009 full year. The net loss available to common shareholders was $15.7 million for the 2009 fourth quarter and $22.7 million for the 2009 full year. On a fully diluted basis, the net loss available to common shareholders was $0.23 per share for the 2009 fourth quarter and $0.33 per share for the 2009 full year.

The main factors in 2009 fourth quarter and full-year results were:

•      Increases in advisory revenue, driven largely by growth in the Corporate Client Services business.

•      Increases in the provision for loan losses, which reduced net interest income. The provision reflected higher levels of nonperforming loans and charge-offs, as well as risk rating downgrades, primarily in the commercial construction portfolio.

•      Securities losses, due mainly to other-than-temporary impairments of pooled trust-preferred securities (TruPS) in the investment securities portfolio.

•      Preferred stock dividends and discount accretion, which affected the net loss available to common shareholders.

"While recessionary pressures on our borrowers increased credit costs and reduced net interest income, our Corporate Client Services business recorded its best quarter ever, and our Wealth Advisory Services business continued to do well amid difficult market conditions," said Ted T. Cecala, Wilmington Trust chairman and chief executive officer. "Our 2009 financial performance underscores the benefits of our diversified business model, as growth in revenue from our fee-based businesses mitigated the recession's negative effects on our banking business."

The company's capital position remained strong. At December 31, 2009, all regulatory capital ratios exceeded the amounts required by the Federal Reserve Board to be considered well capitalized, both including and excluding the $330 million in Capital Purchase Program funds the company received in December 2008 in exchange for issuing shares of Wilmington Trust Series A preferred stock to the U.S. Department of the Treasury.

\* \* \*

Operating results

On a reported basis, Wilmington Trust recorded a $4.4 million loss for the 2009 full year, largely because of the OTTI securities losses recorded during the year. On an operating basis (excluding losses on OTTI securities), the company was profitable for the 2009 full year.

Full-year 2009 operating net income was $45.4 million and operating earnings were $0.39 per diluted common share. Except for the securities losses, the dynamics that affected operating results for the year were the same as the factors that affected reported results.

"Our 2009 full-year operating results demonstrate the core earnings potential inherent in our diversified business mix," Mr. Cecala said. "We were able to absorb a $205 million loan loss provision and still record an operating profit, thanks to the contributions of our advisory businesses."

28.     Regarding the purported performance of the Company's Regional Banking

Services segment, the January 29, 2010 release stated, in part, the following:

Regional Banking Services

Core deposit growth continued. Core deposit balances, on average, were $6.74 billion. This was 22% higher than for the year-ago fourth quarter, and 1% higher than for the 2009 third quarter (trailing quarter). On a period-end basis, core deposits were $7.12 billion at December 31, 2009, marking the first time in the company's history that core deposits exceeded $7 billion.

14

Economic conditions in the mid-Atlantic region muted loan demand. Total loan balances, on average, were $8.99 billion. This was 7% lower than for the year-ago fourth quarter, and 1% lower than for the trailing quarter. Increases in commercial mortgage loan balances were offset by declines in commercial, financial, and agricultural loan balances, as well as in indirect consumer loan balances.

Commercial mortgage loan balances, on average, were $2.09 billion for the 2009 fourth quarter, an increase of 14% from the year-ago fourth quarter and 3% from the trailing quarter. This growth reflected financing opportunities with strong income-producing properties in the region.

More than half of commercial mortgage loans at December 31, 2009, were for owner-occupied properties. Approximately 18% were for community shopping centers. The rest were for a variety of other types of commercial and industrial properties. Approximately 57% of commercial mortgage loans were for properties in Delaware, with the majority in the northern part of the state.

The net interest margin for the 2009 fourth quarter was 3.12%, which was 7 basis points lower than for the trailing quarter. This compression was caused by the increase in nonperforming loans and by yield declines in the investment securities portfolio, as securities added during the quarter had lower yields than those that matured or were sold during the quarter. The 2009 fourth quarter margin was 19 basis points lower than for the year-ago fourth quarter, which is when the Federal Open Market Committee dropped short-term market interest rates to the historically low range of 0.00% to 0.25%.

29.     Regarding the purported performance of the Company's credit quality, the

January 29, 2010 release stated, in part, the following:

Credit quality

Most of the trailing-quarter changes in net charge-offs, nonperforming loans, internal risk ratings, and other credit quality metrics were associated with commercial construction loans, primarily for residential land and construction projects in Delaware. Many of these changes reflected declines in collateral valuations.

"Delaware was among the 20 fastest-growing states in each of the past three years, and that population growth drove the increase in our commercial construction loan balances," Mr. Cecala said. "Given the downturn in the housing market, it is no surprise that most of the deterioration we have seen in credit quality has been associated with construction borrowers in Delaware. The trends in commercial and industrial loans and commercial mortgage loans are less severe."

15

Net charge-offs for the 2009 fourth quarter were $33.1 million, which was $11.3 million higher than for the trailing quarter. Commercial construction loans accounted for $6.8 million, or 60%, of this increase. The net charge-off ratio was 0.37% for the 2009 fourth quarter and 1.21% for the full year.

Nonaccruing loans at December 31, 2009, were $455.6 million, an increase of $88.1 million from the trailing quarter. Commercial construction loans accounted for $74.1 million, or 84%, of this increase. Nonaccruing commercial, financial, and agricultural loans decreased 10% from September 30, 2009.

Renegotiated loans on accrual status at December 31, 2009, were $28.5 million, a $26.3 million increase from the trailing quarter. Approximately 50% of this increase was associated with one commercial borrower. "Renegotiating loans is one of the steps we take to help borrowers return their loans to performing status," Mr. Cecala said.

Other real estate owned (OREO) at December 31, 2009, was $34.6 million, a $6.8 million increase from the trailing quarter. Three commercial construction projects accounted for most of this increase. One was a residential development in Delaware, one was a health club in Maryland, and one was a manufacturing plant in Pennsylvania. Management regards moving properties to OREO as a positive step in the loan work-out process, because it gives the company control of the situation and the ability to facilitate disposition of the property.

For the 2009 fourth quarter, the provision for loan losses was $82.8 million, compared with $38.7 million for the trailing quarter. For the 2009 full year, the provision was $205.0 million, compared with $115.5 million for 2008.

At December 31, 2009, the reserve for loan losses was $251.5 million, compared with $201.8 million at September 30, 2009, and $157.1 million at the end of 2008. The loan loss reserve ratio rose to 2.80%, compared with 2.24% at September 30, 2009, and 1.63% at the end of 2008.

More than half of the increases in the provision and reserve for loan losses were associated with commercial construction loans in Delaware.

30.     Regarding the purported performance of the Company's Corporate Client

Services segment, the January 29, 2010 release stated, in part, the following:

Corporate Client Services

Corporate Client Services (CCS) revenue for the 2009 fourth quarter rose to $46.8 million. This was 18% higher than for the year-ago fourth quarter, and 7% higher than for the trailing quarter.

16

Global corporate trust services accounted for the majority of the 2009 fourth quarter growth in total CCS revenue compared to the trailing quarter and year-ago fourth quarter. (Effective with the 2009 fourth quarter, the CCS capital markets services and entity management services revenue lines were combined and renamed "global corporate trust services.")

Within global corporate trust services, demand remained strong for default and bankruptcy administration services, successor loan agency services, and high-yield corporate debt services. CCS is providing successor trustee or other administrative services for most of the largest recent bankruptcies, including the General Motors and Lehman Brothers bankruptcies.

"The tremendous growth in global corporate trust services shows how we have shifted our product mix in response to the changing environment," Mr. Cecala said. "It also demonstrates how being an independent, conflict-free service provider has helped us capture more business."

For the 2009 full year, CCS revenue was $171.4 million. This was $39.6 million, or 30%, higher than for 2008. Retirement services generated $30.1 million of this growth, largely due to acquisitions completed in April and October 2008. Global corporate trust services generated $8.5 million of this growth. The rest of the increase came from institutional investment and cash management services.

31.     Regarding the purported performance of the Company's Wealth Advisory

Services segment, the January 29, 2010 release stated, in part, the following:

Wealth Advisory Services

Wealth Advisory Services (WAS) revenue for the 2009 fourth quarter was $47.4 million. This was 12% lower than for the year-ago fourth quarter, but 3% higher than for the trailing quarter. For the 2009 full year, WAS revenue was $190.2 million. This was 15% lower than for 2008.

WAS business development remained solid throughout 2009, but WAS revenue was affected by:

- Pressures on trust and investment advisory revenue due to changes in client investment management preferences. In late 2008, many clients began to shift from equity investments into fixed income instruments and cash as a way to reduce volatility in their portfolios and to take advantage of increased Federal Deposit Insurance Corporation (FDIC) coverage. This shift reduced revenue because the company's pricing is lower for fixed income investment and cash management services than for equity investment management services. WAS trust and investment advisory revenue for the 2009 full year was 13% lower than for 2008.

17

- A significant decrease in mutual fund revenue. With market interest rates at historic lows, mutual fund yields declined in 2009, which led the company to waive its mutual fund management fees. These waivers reduced WAS revenue by approximately $4.3 million for the 2009 fourth quarter and by approximately $10.6 million for the 2009 full year.

"We gained more business from existing clients, and we added new clients who were attracted by our reputation as a superior fiduciary and service provider," Mr. Cecala said. "The fact that Wealth Advisory Services is one of our core businesses has been a competitive advantage amid the distractions and disruptions at many larger financial institutions over the past 15 months."

32.    Regarding the purported performance of the Company's expenses, the January 29,

2010 release stated, in part, the following:

Expenses

Expense management remained paramount. Total noninterest expense for the 2009 fourth quarter was $130.6 million. This was 1% lower than for the year-ago fourth quarter, and 3% higher than for the trailing quarter. The largest trailing-quarter increase was in salaries and wages, and associated with staff additions in CCS and WAS.

33.    Regarding the purported performance of the  Company's investment securities

portfolio, the January 29, 2010 release stated, in part, the following:

Investment securities portfolio

Investment securities balances at year-end 2009 were $860.5 million. This was 37% lower than at yearend 2008, but 41% higher than at the end of the 2009 third quarter. The majority of the trailing quarter increase occurred in December 2009, when management opted to deploy cash at the holding company level by investing in short-term U.S. Treasury securities.

In the 2009 fourth quarter, 18 of the 38 pooled TruPS in the company's investment securities portfolio were determined to be other-than-temporarily impaired (OTTI), and the corresponding write-down in their valuation was $17.7 million. Of this amount, $11.5 million was related to credit quality and recorded as securities losses. The remaining $6.2 million of the write-down was recorded in other comprehensive income, which reduced common stockholders' equity by $4.0 million on an after-tax basis.

For the 2009 full year, OTTI write-downs totaled $147.4 million, mostly for pooled TruPS. Of this amount, $77.5 million was recorded as securities losses. The remaining $69.9 million of the write-down was recorded in other comprehensive income, which reduced common stockholders' equity by $44.7 million on an after-tax basis. On an after-tax basis, OTTI securities losses reduced 2009 full- year net income by approximately $49.8 million and earnings by approximately $0.72 per diluted common share.

34.    While shares of the Company slid 14% following the publication of these results, this decline represented a significant reversal from the stock's recent bullish movement. In fact, from January 4, 2010 through January 28, 2010, Wilmington Trust shares had risen from $12.33 to over $15.00, and since the middle of December, shares of the Company had been on a mostly upward trend. Moreover, the 23 cent loss for the fourth quarter missed analysts' expectations of a small 4 cent earnings per share. Three million shares of Wilmington Trust were traded on January 29, 2010 - - more than three times its average daily volume of 729,000 shares - - and the $2.14 share price decline brought Wilmington Trust shares to a close of $13.12 at day-end.

35.    That same day, January 29, 2010, *TheStreet.com*, a popular investor news site on the Internet, published a report on the Company, and observed that, "Wilmington tried to send a positive message about gains in its wealth advisory business and among corporate clients, as a sign that it was properly diversified...." *TheStreet.com* also noted that the Company "will now also have to take significant steps to renew investor confidence..."

36.    As shares of Wilmington Trust continued to trade at artificially inflated levels, on February 22, 2010, defendants filed with the SEC the Company's 2009 Form 10-K, for the year ended December 31, 2009, signed by all defendants and certified by defendants Cecala and Gibson.   In addition to making substantially similar statements concerning the Company operations, including expenses, costs and ratios, as had been published previously, the 2009

19

Form 10-K also provided statements concerning the Company's controls and procedures, as follows:

Item 9A. Controls and Procedures

Our chairman and chief executive officer, as well as our chief financial officer, evaluated the effectiveness of our disclosure controls and procedures as of December 31, 2009, pursuant to Securities Exchange Act Rule 13a-15(e). Based on that evaluation, they concluded that our disclosure controls and procedures were effective in alerting them on a timely basis to any material information about our company (including our consolidated subsidiaries) that we are required to include in the periodic filings we make with the Securities and Exchange Commission. There was no change in our internal control over financial reporting during 2009 that materially affected, or is reasonably likely to have a material effect on, our internal control over financial reporting.

37.    In addition to the foregoing, the Company's 2009 Form 10-K also contained certifications by defendants Cecala and Gibson that attested to the purported accuracy and completeness of the Company's financial and operational reports, as follows:

**CERTIFICATION**

1.    I have reviewed this annual report on Form 10-K of Wilmington Trust Corporation;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure

20

that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

February 22, 2010

/s/ Ted T. Cecala
TED T. CECALA
Chairman of the Board and Chief Executive Officer

\*     \*     \*

February 22, 2010

/s/ David R. Gibson
DAVID R. GIBSON
Executive Vice President and Chief Financial Officer

21

38.     The statements made by defendants and contained in the Company's January 29,
2010 release and those statements contained in the Company's 2009 Form 10-K were each
materially false and misleading when made, and were know by defendants to be false at that time
or were recklessly disregarded as such thereby for the reasons stated herein in ¶26, *supra*.

39.     Despite the minimal share price decline at the end of January, by late-February
shares of the Company leveled off above $13.00 per share. Accordingly, on February 23, 2010,
the last reported sale of the Company's common stock on the NYSE was $13.83 per share.
Thus, taking advantage of the artificial inflation in the price of Wilmington Trust shares caused
as a result of defendants' publication of materially false and misleading information, that day,
defendants also registered for sale and later sold over 21.706 million shares of common stock,
priced at $13.25 - - to reap illicit gross proceeds of over $ 287.607 million, including the
underwriters oversubscription option to purchase and additional 2.831 million shares.

40.     Following the sale of over $287.6 million in Company stock and in an effort to
further restore investor confidence, on April 23, 2010, when the Company announced results for
the first quarter of 2010, the period ended March 31, 2010, the Company published a release that
stated, in part, the following:

> WILMINGTON, Del.--(BUSINESS WIRE)--April 23, 2010--Wilmington Trust
> Corporation (NYSE:WL) reported a loss of $29.2 million for the 2010 first
> quarter. After dividends and accretion on preferred stock, the net loss available to
> common shareholders was $33.8 million. On a fully diluted basis, the net loss
> available to common shareholders was $0.44 per share.
>
> Revenue from the Corporate Client and Wealth Advisory Services businesses
> helped mitigate a decline in loan balances and other recessionary pressures on the
> Regional Banking business. Core deposit balances reached a record high, on
> average, and capital and liquidity improved. Nonperforming assets were higher
> than for the 2009 fourth quarter, but the increase was the smallest since the 2008
> third quarter. Net charge-offs and the net charge-off ratio were lower than for the
> 2009 fourth quarter.

22

Despite these positive trends, economic conditions in Delaware are improving more slowly than elsewhere in the mid-Atlantic region. Due to uncertainty about the pace of Delaware's recovery, as well as credit risk rating downgrades, management added $48.3 million to the reserve for loan losses and recorded a provision for loan losses of $77.4 million. The amount of the provision, coupled with $18.0 million of investment securities impairment charges, reduced revenue and resulted in a net loss for the quarter.

"Corporate Client Services had another quarter of record-high revenue, Wealth Advisory Services benefited from demand for our fiduciary expertise, and we kept a tight rein on expenses," said Ted T. Cecala, Wilmington Trust chairman and chief executive officer. "These positives were muted by the reserve and provision for loan losses, which we increased because Delaware's economy is lagging the improvements seen elsewhere in the United States. While there are some encouraging signs, they are uneven and not broad-based."

The company's already-strong capital position and regulatory capital ratios improved in the 2010 first quarter, due to the common stock offering that was completed on March 1, 2010. This offering raised $274.0 million (net of commissions and expenses). As of March 31, 2010, all regulatory capital ratios continued to exceed the amounts required by the Federal Reserve to be considered well capitalized.

41.     Regarding the purported performance of the Company's Regional Banking

Services segment, the April 23, 2010 release stated, in part, the following:

The Regional Banking business

Core deposit balances for the 2010 first quarter were $7.24 billion, on average. This record-high amount was an increase of 23% from the year-ago first quarter, and 7% from the 2009 fourth (trailing) quarter. Most of the increase was in interest-bearing demand deposits.

The growth in core deposits improved liquidity and reduced the need for non-core sources of funding. The percentage of funding from core deposits, on average, increased to 82%, up from 60% for the year-ago first quarter, and 77% for the trailing quarter.

Weakness in the mid-Atlantic regional economy continued to reduce loan demand. For the 2010 first quarter, total loan balances decreased to $8.83 billion, on average. This was 7% lower than for the year-ago first quarter, and 2% lower than for the trailing quarter. Decreases occurred in the commercial and retail portfolios.

Commercial loan balances for the 2010 first quarter were $6.60 billion, on average. Compared to the trailing quarter, commercial, financial, and agricultural (CF&A) loans were $56.7 million lower; commercial real estate/construction loans were $36.8 million lower; and commercial mortgage loans were $33.0 million higher.

Commercial real estate/construction loan balances declined due to pay downs, charge-offs, and movement of completed projects to the commercial mortgage portfolio. The movement of completed projects accounted for most of the increase in commercial mortgage balances.

More than half of commercial mortgage loans at March 31, 2010, were for owner-occupied properties. Approximately 18% were for community shopping centers. The rest were for a variety of other types of commercial and industrial properties. Approximately 57% of commercial mortgage loans were for properties in Delaware, with the majority in the northern part of the state.

Retail loan balances for the 2010 first quarter were $2.22 billion, on average, which was $98.4 million lower than for the trailing quarter. The majority of this decrease was in indirect loan balances in the consumer portfolio. Most of these loans are for new and late-model automobiles, and made through automobile dealers in the mid-Atlantic region.

The net interest margin for the 2010 first quarter was 3.03%. This was 16 basis points higher than for the year-ago first quarter, but 9 basis points lower than for the trailing quarter. The trailing-quarter decline was caused by a combination of lower yields in the investment securities portfolio, the increase in nonperforming loans, and the decrease in loan balances.

A comparison of changes in earning assets and net interest income illustrates the company's ability to manage through considerable changes in loan and investment securities balances over the past 12 months. For the 2010 first quarter, earning assets were $10.1 billion, on average, and net interest income (before the provision for loan losses) was $74.7 million. For the year-ago first quarter, earning assets were $11.1 billion, on average, and net interest income (before the provision) was $78.5 million.

"Compared to the year-ago first quarter, earning assets decreased $1.0 billion, or 9%, but the decrease in our net interest income was only $3.8 million, or 5%," said Mr. Cecala. "This is just one example of how well we are positioned to benefit when the economy recovers and short-term market interest rates rise."

42.     Regarding the purported performance of the Company's credit quality, the April

23, 2010 release stated, in part, the following:

24

Credit quality

Nonperforming assets increased during the 2010 first quarter, but the increase was the lowest since the 2008 third quarter. Compared to the trailing quarter, the reserve for loan losses was higher, while the provision for loan losses, net charge-offs, and the net charge-off ratio were lower.

Nonaccruing loans were $468.9 million at March 31, 2010, which was $13.3 million higher than at year-end 2009. Nonaccruing commercial real estate/construction loans decreased, while other categories of nonaccruing loans increased.

Most of the increase in nonaccruing loans was in commercial mortgage loans, which rose $14.3 million in the 2010 first quarter. Four credits accounted for the majority of this increase. One was to a Pennsylvania-based operator of self-storage facilities. The others were to Delaware-based owners of retail properties and low-rise professional office buildings.

*   *   *

Nonperforming commercial real estate/construction loans decreased $18.0 million during the 2010 first quarter. Charge-offs accounted for approximately $12.1 million of this decrease. The remainder reflected transfers to other real estate owned (OREO).

OREO totaled $46.3 million at March 31, 2010, up $11.7 million from year-end 2009. Three credits to residential developers with projects in southern Delaware accounted for this increase.

Renegotiated loans (accruing) at March 31, 2010, were $35.7 million, an increase of $7.2 million from year-end 2009. One credit to a plumbing supply company in southern Delaware accounted for almost all of this increase.

Loans past-due 90 days or more totaled $39.7 million at March 31, 2010, up from $30.6 million at year-end 2009. Most of this increase was associated with commercial real estate/construction loans that have matured but not paid off, and for which underwriting extensions are underway.

Net charge-offs for the 2010 first quarter were $29.1 million, down from $33.1 million on a trailing-quarter basis. The net charge-off ratio for the 2010 first quarter was 0.33%, down from 0.37% for the trailing quarter.

Most of the commercial loan net charge-offs in the 2010 first quarter were for residential projects in southern Delaware or businesses that support the housing industry. The increase in consumer and other retail net charge-offs was caused by a single home equity loan.

25

In the internal risk rating analysis, the percentage of watchlist- and substandard-rated loans continued to increase. These downgrades, an assessment of regional economic indicators, and other factors led management to add $48.3 million to the reserve for loan losses. This brought the reserve to $299.8 million at March 31, 2010, or 3.44% of loans outstanding. In comparison, the loan loss reserve ratio was 1.77% at the end of the year-ago first quarter, and 2.80% at year-end 2009.

43.     Regarding the purported performance of the Company's Corporate Client Services segment, the April 23, 2010 release stated, in part, the following:

Corporate Client Services

Corporate Client Services (CCS) revenue for the 2010 first quarter was $48.0 million. This was 21% higher than for the year-ago first quarter, and 2% higher than for the trailing quarter.

Most of the year-over-year and trailing-quarter growth was in retirement services revenue. A combination of higher retirement plan asset valuations and new business accounted for these increases. Much of the new business development was in collective investment fund services and services that support defined contribution retirement plans.

Global corporate trust services revenue was 19% higher than for the year-ago first quarter. This was due to strong demand for successor loan agency services, default and bankruptcy administration services, and high-yield corporate debt services. Compared to the trailing quarter, global corporate trust revenue fell 8%, because there was less activity in the capital markets overall.

44.     Regarding the purported performance of the Company's expenses, the April 23, 2010 release stated, in part, the following:

Expenses

Total noninterest expense for the 2010 first quarter was $131.5 million. This was 4% higher than for the year-ago first quarter, and 1% higher than for the trailing quarter.

45.     Regarding the purported performance of the Company's investment securities portfolio, the April 23, 2010 release stated, in part, the following

Investment securities portfolio

Investment securities balances at March 31, 2010, were $765.0 million. This was 11% lower than at year-end 2009. Most of the decrease was in government agency securities, due to maturities and calls.

On average, investment securities balances were higher on a trailing-quarter basis. Average balances for the 2010 first quarter reflected maturities of government agency securities that did not occur until late in the quarter, as well as short-term investments in U.S. Treasury securities that were made near the end of the 2009 fourth quarter.

Most of the securities losses in the 2010 first quarter resulted from declines in the valuations of pooled trust-preferred securities (TruPS) due to economic conditions. A pooled trust-preferred security is an instrument that aggregates multiple trust-preferred securities issued by banks, insurance companies, and other financial institutions into a group, or pool.

In the 2010 first quarter, the valuation declines on 23 of the 38 pooled TruPS in the company's portfolio were determined to be other-than-temporary. Many of these declines occurred because some of the underlying issuers in the pools have defaulted, or have the potential to default, on their cash flow obligations.

The 2010 first quarter write-down on these other-than-temporarily impaired (OTTI) pooled TruPS was $29.8 million. Of this amount, $17.9 million was related to credit quality and recorded as a securities loss. The remaining $11.9 million of the write-down was recorded in other comprehensive income, which reduced common stockholders' equity by $7.6 million on an after-tax basis. At March 31, 2010, the amortized cost of the pooled TruPS portfolio was $130.4 million; its estimated fair value was $48.8 million; and its carrying value was $47.3 million. The $83.1 million difference between the amortized cost of the pooled TruPS and their carrying value, which represents the non-credit-related portion of their impairment, was recorded in accumulated other comprehensive income, and reflected in the company's tangible common equity ratio as of March 31, 2010.

46.    The publication of these statements by defendants had their intended effect and shares of the Company closed trading that day at just below $18.50 per share.

47.    As shares of Wilmington Trust continued to trade at artificially inflated levels, on May 10, 2010, defendants filed with the SEC the Company's 1Q:10 Form 10-Q, for the first quarter ended March 31, 2010, signed and certified by defendants Cecala and Gibson. In addition to making substantially similar statements concerning the Company operations,

27

including expenses, costs and ratios, as had been published previously, the 1Q:10 Form 10-Q

also provided statements concerning the Company's controls and procedures, as follows:

ITEM 4. CONTROLS AND PROCEDURES

Our chairman and chief executive officer, as well as our chief financial officer, evaluated the effectiveness of our disclosure controls and procedures as of March 31, 2010, pursuant to Securities Exchange Act Rule 13a-15(e). Based on that evaluation, they concluded that our disclosure controls and procedures were effective in alerting them on a timely basis to any material information about our company (including our consolidated subsidiaries) that we are required to include in the periodic filings we make with the Securities and Exchange Commission. There was no change in our internal control over financial reporting during the first quarter of 2010 that materially affected, or is reasonably likely to have a material effect on, our internal control over financial reporting.

48.     In addition to the foregoing, the Company's 1Q:10 Form 10-Q also contained

certifications by defendants Cecala and Gibson that attested to the purported accuracy and

completeness of the Company's financial and operational reports, as follows:

SECTION 1350 CERTIFICATIONS
PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

The undersigned certify that, to their knowledge, the Form 10-Q of Wilmington Trust Corporation (the Corporation) for the first quarter of 2010 fully complies with the requirements of section 13(a) of the Securities Exchange Act of 1934 and that the information contained in that report fairly presents, in all material respects, the financial condition and results of operation of the Corporation.

/s/ Ted T. Cecala
Ted T. Cecala
Chairman of the Board and Chief Executive Officer

/s/ David R. Gibson
David R. Gibson
Executive Vice President and Chief Financial Officer

49.     The statements made by defendants and contained in the Company's April 23,

2010 releases and those statements contained in the Company's 1Q:10 Form 10-Q were each

materially false and misleading when made, and were know by defendants to be false at that time

or were recklessly disregarded as such thereby for the reasons stated herein in ¶26, *supra*.

50.     Moreover, in an effort to continue to invoke investor confidence, on July 23,

2010, when the Company announced results for the second quarter of 2010, the period ended

June 30, 2010, the Company published a release that again stated, in part, the following:

WILMINGTON TRUST ANNOUNCES 2010 SECOND QUARTER RESULTS

Wilmington, Del., July 23, 2010 – Wilmington Trust Corporation (NYSE: WL)
reported a loss of $116.4 million for the 2010 second quarter. After dividends and
accretion on preferred stock, the net loss available to common shareholders was
$120.9 million, or $1.33 per share.

The primary cause of the loss was the amount of the provision for loan losses,
which rose to $205.2 million, following increases in nonperforming loans, loan
charge-offs, and loans with unfavorable risk ratings. Other contributing factors
were $18.8 million of credit-related expenses and $7.7 million of securities losses.

The negative trends in credit reflected continuing economic pressures, particularly
in southern Delaware, that weakened the financial condition of some borrowers
and caused commercial real estate valuations to decline significantly.
Management's assessment of these factors and economic conditions overall led to
an increase in the reserve for loan losses and other actions to reduce risk in the
loan portfolio.

"My priority is to return our company to profitability and position our businesses
for future growth, but first we must continue to deal with the lingering effects of a
weak economy and housing market. Our second quarter results demonstrate we
are doing that," said Donald E. Foley, Wilmington Trust's chairman and chief
executive officer. "We are fully committed to working through our credit issues,
relying on robust risk management tools and analyses.

"At the same time, we remain focused on our strong relationships with clients,
and on capitalizing on opportunities to increase revenue from our advisory
businesses," Mr. Foley added. "We have the market positions, capital strength,
and talented people to accomplish these objectives. While no one can predict
when economic conditions will improve, we will manage our credit challenges
effectively and, over the coming months, begin to position our company to
capitalize fully on its many strengths."

2010 SECOND QUARTER SUMMARY

- Net charge-offs were $131.2 million, an increase of $102.1 million from the 2010 first (trailing) quarter.

- The reserve for loan losses was $373.8 million, an increase of $74.0 million.

- Noninterest income rose to $100.9 million, an increase of 13%.

- Noninterest income accounted for 59% of total revenue (net interest income before the loan loss provision and noninterest income after amortization and excluding securities gains/losses).

- Corporate Client Services revenue was $51.3 million, another quarterly record high.

- Wealth Advisory Services trust and investment advisory revenue declined 4% from the trailing quarter, which was less than half the decline in the Dow Jones Industrial Index, the Standard & Poor's 500 Index, and the NASDAQ for the same period.

- Economic pressures reduced demand for new loans, and loan balances decreased.

- Liquidity improved, as core deposits provided 83% of total funding, compared with 82% for the trailing quarter.

- The net interest margin improved to 3.15%, an increase of 12 basis points from the trailing quarter.

- The company's capital position remained strong. All regulatory capital ratios continued to exceed those required by the Federal Reserve for banks to be considered well capitalized.

- The ratio of risk-based capital to total risk-weighted assets was 16.65%, compared with the 10.00% required to be considered well capitalized.

- The amount of risk-based capital was $1.64 billion. This was $656.9 million more than the amount required to be considered well capitalized.

Financial summary

| (dollars in millions, except per-share amounts) | June 30, 2010 | Three months ended March 31, 2010 | June 30, 2009 |
|---|---|---|---|
| Net interest income | $  74.8 | $  74.7 | $  81.6 |

| | | | | | |
|---|---|---|---|---|---|
| Provision for loan losse | | (205.2) | | (77.4) | (54.0) |
| Securities losses | | (7.7) | | (17.8) | (23.4) |
| Noninterest income | | 100.9 | | 89.5 | 81.6 |
| Noninterest expense | | 154.2 | | 131.5 | 128.4 |
| Net loss | $ | (116.4) | $ | (29.2) | $ (9.1) |
| Dividends and accretion on preferred stock | | 4.5 | | 4.6 | 4.5 |
| Net loss available to common shareholders | $ | (120.9) | $ | (33.8) | $ (13.6) |
| Net loss per common share | | $(1.33) | $ | (0.44) | $ (0.20) |

51.     In addition to the foregoing, the July 23, 2010 release also stated that, at that time,

the Company had already adjusted its loan loss provisions and reserves for charge offs, in part, as

follows:

> The financial condition of some borrowers weakened in the second quarter, especially in southern Delaware, where signs of economic recovery remain tentative. In addition, updated real estate appraisals received during the quarter revealed significant declines in collateral valuations. These factors led management to increase loan loss estimates, charge off more loans, downgrade risk ratings, and add $74.0 million to the reserve for loan losses.

> Selected credit metrics

> | | | Three months ended | | |
> |---|---|---|---|---|
> | (dollars in millions) | June 30, 2010 | March 31, 2010 | | June 30, 2009 |
> | Loan balances (period-end $ | 8,387.7 | $ 8,715.6 | $ | 9,175.2 |
> | Total nonperforming assets | 559.7 | 550.9 | | 330.3 |
> | Loans past due 90 days or more | 106.2 | 39.7 | | 26.7 |
> | Loans with substandard risk ratings | 1,451.5 | 1,089.3 | | 662.2 |
> | Net charge-offs | 131.2 | 29.1 | | 36.2 |
> | Reserve for loan losses | 373.8 | 299.8 | | 184.9 |
> | Ratio of loan loss reserve to total loans | 4.46 % | 3.44 % | | 2.02 % |
> | Ratio of nonperforming assets to total loans and OREO | 6.64 | 6.29 | | 3.59 |
> | Ratio of loan loss reserve to nonperforming assets | 66.79 | 54.42 | | 55.98 |
> | Ratio of net charge-offs to total loans (not annualized) | 1.53 | 0.33 | | 0.39 |

> Commercial real estate/construction loans accounted for approximately two-thirds of the trailing quarter increase in net charge-offs. Most of these loans were for residential projects in southern Delaware, and largely for parcels of land in various stages of development.

> Nonaccruing loans accounted for $479.9 million of nonperforming assets at June 30, 2010, compared with $468.9 million at March 31, 2010. During the 2010 second quarter, nonaccruing loans of approximately $119.4 million were charged off, and loans of approximately $130.0 million were added. Approximately one-half of the new nonaccruing loans were commercial real estate/construction loans.

The remainder was split fairly evenly between the other two categories of commercial loans.

During the 2010 second quarter, property valued at $4.5 million was transferred to other real estate owned (OREO), and OREO valued at $6.6 million was sold or written down. This brought the OREO balance at June 30, 2010, to $44.2 million, which was $2.1 million lower than for the trailing quarter.

Loans past due 90 days or more were $66.5 million higher than at the end of the first quarter. Commercial, financial, and agricultural loans accounted for approximately one-half of this increase, and real estate-related loans accounted for most of the rest. Loans past due 90 days or more at June 30, 2010, included approximately $39.3 million of matured loans that are being renewed.

Loans 30 to 89 days past due decreased to $81.0 million from $108.3 million for the trailing quarter. This decrease reflected a combination of transfers to past due 90 days or more, transfers to nonaccruing status, returns to current status, and charge-offs.

                                         *    *    *

"In addition to increasing the loan loss reserve, lowering risk ratings, and recognizing losses, we made management changes in the lending and credit review areas, added loan work-out staff, and continued aggressive work-out strategies. Also, to validate our own examination of the portfolio, we engaged an independent third-party credit review firm to take an objective look at our policies, procedures, and risk ratings, and their review and analysis supported our conclusions," Mr. Foley said. "It is difficult to predict how quickly the economy and collateral values will stabilize and allow us to put these problems behind us. In the meantime, our rigorous scrutiny of credit risk continues."

The financial statement section of this release contains additional information about credit quality and the composition of the reserve for loan losses.

52.     To further restore investor confidence at that time, defendants also used this release to condition investors to believe that despite loan balance declines, core deposits helped to improve Wilmington Trusts liquidity. In this regard the July 23, 2010 release stated, in part, the following:

LOAN BALANCES DECLINE; CORE DEPOSITS HELP IMPROVE LIQUIDITY

Loan demand remained weak, and loan balances declined on both a period-end and average-balance basis, in both the commercial and the retail portfolios. Management expects loan balances to decrease by an additional $200 million to $600 million by year-end 2010.

Liquidity continued to improve, as the percentage of funding from core deposits continued to increase. On average, non-core funding was $188.8 million lower than for the trailing quarter.

Loans, core deposits, and liquidity

| | | | Three months ended | | | | |
|---|---|---|---|---|---|---|---|
| (dollars in millions, on average) | June 30, 2010 | | | March 31, 2010 | | | June 30, 2009 |
| Loans | $ | 8,597.0 | $ | 8,828.3 | | $ | 9,396.2 |
| Noninterest-bearing demand deposits | | 780.5 | | 1,307.5 | | | 1,246.6 |
| Total core deposits | | 6,763.4 | | 7,239.4 | | | 6,602.4 |
| Percentage of funding from core deposits | | 83 % | | 82 % | | | 72 % |

The trailing-quarter decrease in total core deposits, on average, was mainly the result of a large decrease in noninterest-bearing demand deposits. Most of this decrease was associated with short-term deposits from a CCS client that were on deposit for most of the 2010 first quarter and, therefore, reflected in first quarter average balances. Near the end of the first quarter, the client distributed funds from the account, reducing its balance and creating a decline, on an average-balance basis, between the first and second quarters of 2010. CCS clients commonly make short-term transactional deposits, and changes in CCS client deposits do not necessarily indicate trends in new or lost business.

53.    In addition, defendants also used this release to condition investors to believe that despite other weakness, that the Company's net interest margin was improving due to lower funding costs. In this regard the July 23, 2010 release stated, in part, the following:

NET INTEREST MARGIN IMPROVES ON LOWER FUNDING COSTS

Net interest income was slightly higher than for the trailing quarter, and the net interest margin expanded by 12 basis points. The margin improvement reflected increases in commercial loan yields and decreases in the cost of funds.

Net interest income and net interest margin

| | | | Three months ended | | |
|---|---|---|---|---|---|
| (dollars in millions) | June 30, 2010 | | March 31, 2010 | | June 30, 2009 |
| Net interest income (before the loan loss provision | $ | 74.8 | $ | 74.7 | $ | 81.6 |

33

| Quarterly net interest margin | 3.15 % | 3.03 % | 3.14 % |

The yields on some commercial loans were higher due to improvements in the 30-day Libor or other rate increases. At June 30, 2010, approximately 90% of commercial loans had floating rates; the pricing on approximately 40% of these loans was tied to the 30-day Libor.

The cost of funds was lower because the need for non-core deposits declined, due to the decrease in loan balances and the addition of cash from the common equity offering completed in the 2010 first quarter.

Management expects funding costs to increase modestly in the second half of 2010. For the third and fourth quarters of 2010, management expects the net interest margin to be in the 3.00% to 3.10% range, assuming no change in the short-term interest rate environment.

54.     In addition to the foregoing, defendants also used this release to condition investors to believe that the Company's record setting Corporate Client Services revenue was also acting to offset weaker revenues. In this regard, the July 23, 2010 release also stated, in part, the following:

ANOTHER RECORD QUARTER FOR CORPORATE CLIENT SERVICES

Total Corporate Client Services (CCS) revenue was $51.3 million, which was 7% higher than for the trailing quarter. Global corporate trust services generated most of this increase. For the first six months of 2010, CCS revenue was $99.3 million, a 23% increase from the first half of 2009. More than half of this year-to-date increase came from retirement services.

CCS global corporate trust revenue for the 2010 second quarter was $25.3 million, an increase of 10% from the trailing quarter. For the first six months of 2010, global corporate trust revenue was $48.3 million, an increase of 19% from the first half of last year. This was due largely to demand for successor loan agency services, default administration and bankruptcy services, and services that support corporate debt issuances.

Fees for global corporate trust services are priced according to the level and complexity of services provided, and some fees may be extraordinary or one-time in nature. Management estimates that approximately $1.4 million of 2010 second quarter global corporate trust revenue may not recur.

CCS retirement services revenue was $21.5 million, the same as for the trailing quarter, as financial market declines offset the effects of additional plan

34

contributions and new business. For the first six months of 2010, retirement services revenue was $43.0 million, an increase of 32% from the first half of last year. Much of the year-to-date growth was from services that support collective investment funds and from new and expanded relationships with large registered investment advisor firms.

CCS investment and cash management revenue was $4.5 million, an increase of $1.0 million from the trailing quarter. Approximately $700,000 of this amount was a one-time fee that management does not expect to recur. For the first six months of 2010, CCS investment and cash management revenue was $8.0 million, a 3% increase from the first half of last year.

55.     Defendants' statements continued to inflate the price of Company shares. As evidence of this, on July 23, 2010, shares of the Company continued to trade at just below $10.00. Moreover, in the days following the publication of the July 23, 2010 release, shares of Wilmington Trust traded above $10.00 as investors digested the significance of defendants' positive but false statements about the Company.

56.     As shares of Wilmington Trust continued to trade at artificially inflated levels, on August 9, 2010, defendants filed with the SEC the Company's 2Q:10 Form 10-Q, for the second quarter ended June 30, 2010, signed and certified by defendants Foley and Gibson. In addition to making substantially similar statements concerning the Company operations, including expenses, costs and ratios, as had been published previously, the 2Q:10 Form 10-Q also provided statements concerning the Company's controls and procedures, as follows:

ITEM 4. CONTROLS AND PROCEDURES

Our chairman and chief executive officer, as well as our chief financial officer, evaluated the effectiveness of our disclosure controls and procedures as of June 30, 2010, pursuant to Securities Exchange Act Rule 13a-15(e). Based on that evaluation, they concluded that our disclosure controls and procedures were effective in alerting them on a timely basis to any material information about our company (including our consolidated subsidiaries) that we are required to include in the periodic filings we make with the Securities and Exchange Commission. There was no change in our internal control over financial reporting during the second quarter of 2010 that materially affected, or is reasonably likely to have a material effect on, our internal control over financial reporting.

35

57.    In addition to the foregoing, the Company's 1Q:10 Form 10-Q also contained

certifications by defendants Foley and Gibson that attested to the purported accuracy and

completeness of the Company's financial and operational reports, as follows:

SECTION 1350 CERTIFICATIONS
PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

The undersigned certify that, to their knowledge, the Form 10-Q of Wilmington
Trust Corporation (the Corporation) for the second quarter of 2010 fully complies
with the requirements of section 13(a) of the Securities Exchange Act of 1934 and
that the information contained in that report fairly presents, in all material
respects, the financial condition and results of operation of the Corporation.

/s/ Donald E. Foley
Donald E. Foley
Chairman of the Board and Chief Executive Officer

/s/ David R. Gibson
David R. Gibson
Executive Vice President and Chief Financial Officer

58.    The statements made by defendants and contained in the Company's July, 2010

releases and those statements contained in the Company's 2Q:10 Form 10-Q were each

materially false and misleading when made, and were known by defendants to be false at that

time or were recklessly disregarded as such thereby for the reasons stated herein in ¶26, *supra*.

## THE TRUE FINANCIAL AND OPERATIONAL CONDITION
## OF WILMINGTON TRUST IS BELATEDLY DISCLOSED

59.    On November 1, 2010, defendants shocked and alarmed investors after they

revealed that the Company had agreed to be acquired by M&T Bank Corp. for the "fire sale"

price of $3.84 per share in stock - - a 46% discount from the Company's prior day closing stock

price of $7.11 per share.  Adding insult to injury, the same day, defendants also reveled that the

Company reported an unexpectedly large third-quarter loss of $365.3 million compared with a

36

loss of $5.9 million in the year-earlier period, due primarily to bad real estate construction loans in Delaware. At that time, defendants also revealed that more losses were foreseeable, attributed to the Company's real estate portfolio. In addition, defendants also said that the Company had set aside $281.5 million for loan losses, up 37% from the previous quarter, and that non-performing assets climbed more than three-quarters to $988.6 million from the second quarter and represented 12 percent of all loans.

60.     The revelations that the Company had agreed to be acquired for approximately $3.85 per share in M&T stock, and the realization that defendants had materially misrepresented its financial and operational condition, its controls and procedures and its results of operations, belatedly revealed on November 1, 2010 caused shares of Wilmington Trust stock to fall precipitously.

## CAUSATION AND ECONOMIC LOSS

61.     During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market, and a course of conduct that artificially inflated Wilmington Trust's stock price and operated as a fraud or deceit on Class Period purchasers of Wilmington Trust's stock by misrepresenting the Company's financial results. Over a period of approximately twelve months, defendants improperly inflated the Company's financial results. Ultimately, however, when defendants' prior misrepresentations and fraudulent conduct came to be revealed and was apparent to investors, shares of Wilmington Trust declined precipitously - - evidence that the prior artificial inflation in the price of Wilmington Trust's shares was eradicated. As a result of their purchases of Wilmington Trust stock during the Class Period, plaintiff and other members of the Class suffered economic losses, *i.e.*, damages under the federal securities laws.

37

62.     By improperly characterizing the Company's financial results and misrepresent-
ing its prospects, the defendants presented a misleading image of Wilmington Trust's business
and future growth prospects.  During the Class Period, defendants repeatedly emphasized the
ability of the Company to monitor and control expenses, and consistently reported expenses and
expense ratios within expectations and within the range for which the Company was adequately
reserved.  These claims caused and maintained the artificial inflation in Wilmington Trust's
stock price throughout the Class Period and until the truth about the Company was ultimately
revealed to investors.

63.     Defendants' false and materially misleading statements had the intended effect of
causing Wilmington Trust's shares to trade at artificially inflated levels throughout the Class
Period - - reaching a Class Period high of over $20.00 per share on April 22, 2010.

64.     On November 1, 2010, however, as investors learned the truth about the
Company, and learned that defendants had failed to report the Company's financial and
operational results, shares of the Company collapsed.  Defendants' belated disclosures had an
immediate, adverse impact on the price of Wilmington Trust shares.

65.     These belated revelations also evidenced defendants' prior falsification of
Wilmington Trust's business prospects due to defendants' false statements.  As investors and the
market ultimately learned, the Company's prior business prospects had been overstated as were
the Company's results of operations.  As this adverse information became known to investors,
the prior artificial inflation began to be eliminated from Wilmington Trust's share price and were
damaged as a result of the related share price decline.

66.     The decline in Wilmington Trust's stock price at the end of the Class Period was a
direct result of the nature and extent of defendants' fraud being revealed to investors and to the

market.   The timing and magnitude of Wilmington Trust's stock price decline negates any inference that the losses suffered by plaintiff and the other members of the Class was caused by changed market conditions, macroeconomic or industry factors or even Company-specific facts unrelated to defendants' fraudulent conduct.   During the same period in which Wilmington Trust's share price fell over 45% as a result of defendants' fraud being revealed, the Standard & Poor's 500 securities index was relatively unchanged.

    67.      The economic loss, *i.e.*, damages suffered by plaintiff and other members of the Class, was a direct result of defendants' fraudulent scheme to artificially inflate the price of Wilmington Trust's stock and the subsequent significant decline in the value of the Company's shares when defendants' prior misstatements and other fraudulent conduct was revealed.   The dramatic decline in the price of Company shares immediately following defendants' belated disclosure is evidenced, in part, by the chart below:



39

## VIOLATIONS OF GAAP AND SEC REPORTING RULES

68.     During the Class period, defendants materially misled the investing public, thereby inflating the price of the Company's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its financial performance, accounting, reporting, and financial condition in violation of the federal securities laws and GAAP.

69.     GAAP consists of those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at the particular time. Regulation S-X, to which the Company is subject as a registrant under the Exchange Act, 17 C.F.R.  210.4-01(a)(1), provides that financial statements filed with the SEC which are not prepared in compliance with GAAP, are presumed to be misleading and inaccurate. SEC Rule 13a-13 requires issuers to file quarterly reports.

70.     SEC Rule 12b-20 requires that periodic reports contain such further information as is necessary to make the required statements, in light of the circumstances under which they are made, not misleading.

71.     In addition, Item 303 of Regulation S-K requires that, for interim periods, the Management Division and Analysis Section ("MD&A") must include, among other things, a discussion of any material changes in the registrant's results of operations with respect to the most recent fiscal year-to-date period for which an income statement is provided. Instructions to Item 303 require that the this discussion identify any significant elements of registrant's income or loss from continuing operations that are not necessarily representative of the registrant's

40

ongoing business. Item 303(a)(2)(ii) to Regulation S-K requires the following discussion in the

MD&A of a company's publicly filed reports with the SEC:

> Describe any known trends or uncertainties that have had or that the registrant
> reasonably expects will have a material favorable or unfavorable impact on net
> sales or revenues or income from continuing operations. If the registrant knows of
> events that will cause a material change in the relationship between costs and
> revenues (such as known future increases in costs of labor or materials or price
> increases or inventory adjustments), the change in relationship shall be disclosed.

Paragraph 3 of the Instructions to Item 303 states in relevant part:

> The discussion and analysis shall focus specifically on material events and
> uncertainties known to management that would cause reported financial
> information not to be necessarily indicative of future operating results or of future
> financial condition. This would include descriptions and amounts of (A) matters
> that would have an impact on future operations and have not had an impact in the
> past. . .

72.     The GAAP requirement for recognition of an adequate provision for foreseeable

costs and an associated allowance applies to interim financial statements as required by

Accounting Principles Board Opinion No. 28.  Paragraph 17 of this authoritative pronouncement

states that:

> The amounts of certain costs and expenses are frequently subjected to year-end
> adjustments even though they can be reasonably approximated at interim dates.
> To the extent possible such adjustments should be estimated and the estimated
> costs and expenses assigned to interim periods so that the interim periods bear a
> reasonable portion of the anticipated annual amount.

73.     The Company's financial statements contained in the quarterly reports filed with

the SEC on Forms 10-Q for the quarterly periods throughout the Class Period were presented in a

manner that violated the principle of fair financial reporting and the following GAAP, among

others:

(a)     The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Statement of Concepts No. 1).

(b)     The principle that financial reporting should provide information about an enterprise's financial performance during a period (FASB Statement of Concepts No. 1).

(c)     The principle that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Concepts No. 2).

(d)     The principle of completeness, which means that nothing material is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2).

(e)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2).

(f)     The principle that contingencies and other uncertainties that affect the fairness of presentation of financial data at an interim date shall be disclosed in interim reports in the same manner required for annual reports (APB Opinion No. 28).

(g)     The principle that disclosures of contingencies shall be repeated in interim and annual reports until the contingencies and have been removed, resolved, or have become immaterial (APB Opinion No. 28).

(h)     The principle that management should provide commentary relating to the effects of significant events upon the interim financial results (APB Opinion No. 28).

74.     In addition, during the Class Period, defendants violated SEC disclosure rules:

(a)     Defendants failed to disclose the existence of known trends, events or uncertainties that they reasonably expected would have a material, unfavorable impact on net revenues or income or that were reasonably likely to result in the Company's liquidity decreasing in a material way, in violation of Item 303 of Regulation S-K under the federal securities laws (17 C.F.R. 229.303), and that failure to disclose the information rendered the statements that were made during the Class Period materially false and misleading; and

(b)     By failing to file financial statements with the SEC that conformed to the requirements of GAAP, such financial statements were presumptively misleading and inaccurate pursuant to Regulation S-X, 17 C.F.R. 210.4-01(a)(1).

75.     Defendants were required to disclose, in the Company's financial statements, the existence of the material facts described herein and to appropriately recognize and report assets, revenues, and expenses in conformity with GAAP.   The Company failed to make such disclosures and to account for and to report its financial statements in conformity with GAAP. Defendants knew, or were reckless in not knowing, the facts which indicated that all of the Company's interim financial statements, press releases, public statements, and filings with the SEC, which were disseminated to the investing public during the Class Period, were materially false and misleading for the reasons set forth herein.   Had the true financial position and results of operations of the Company been disclosed during the Class period, the Company's common stock would have traded at prices well below that which it did.

## ADDITIONAL SCIENTER ALLEGATIONS

76.     As alleged herein, defendants acted with scienter in that each defendant knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or

43

disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Wilmington Trust, their control over, and/or receipt and/or modification of Wilmington Trust's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Wilmington Trust, participated in the fraudulent scheme alleged herein.

77.     Defendants were motivated to materially misrepresent to the SEC and investors the true financial condition of the Company because their scheme: (a) deceived the investing public regarding Wilmington Trust's business, operations, management and the intrinsic value of Wilmington Trust common stock; (b) enabled defendants to artificially inflate the price of Wilmington Trust shares; (c) enabled defendants to sell over $287.6 million of Wilmington Trust common stock to the public while in possession of material adverse non-public information about the Company; and (d) caused plaintiff and other members of the Class to purchase Wilmington Trust common stock at artificially inflated prices.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

78.     At all relevant times, the market for Wilmington Trust's common stock was an efficient market for the following reasons, among others:

(a)     Wilmington Trust's stock met the requirements for listing, and was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

(b)     As a regulated issuer, Wilmington Trust filed periodic public reports with the SEC and the NYSE;

44

(c)     Wilmington Trust regularly communicated with public investors *via* established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Wilmington Trust was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s).  Each of these reports was publicly available and entered the public marketplace.

79.     As a result of the foregoing, the market for Wilmington Trust securities promptly digested current information regarding Wilmington Trust from all publicly available sources and reflected such information in Wilmington Trust stock price. Under these circumstances, all purchasers of Wilmington Trust common stock during the Class Period suffered similar injury through their purchase of Wilmington Trust common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

80.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded

45

herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Wilmington Trust who knew that those statements were false when made.

## BASIS OF ALLEGATIONS

81.     Plaintiff has alleged the following based upon the investigation of plaintiff's counsel, which included a review of SEC filings by Wilmington Trust, as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## FIRST CLAIM

### Violation Of Section 10(b) Of
### The Exchange Act And Rule 10b-5
### Promulgated Thereunder Against All Defendants

82.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

83.     During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public regarding Wilmington Trust's business, operations, management and the intrinsic value of Wilmington Trust common stock; (b) enable defendants to artificially inflate the price of Wilmington Trust shares; (c) enable defendants to sell over $287.6 million of Wilmington Trust common stock to the public while in possession of material adverse non-public information

about the Company; and (d) cause plaintiff and other members of the Class to purchase Wilmington Trust common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, jointly and individually (and each of them) took the actions set forth herein.

84.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Wilmington Trust's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

85.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Wilmington Trust as specified herein.

86.     These defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Wilmington Trust's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Wilmington Trust and its business operations and future prospects in the light of the circumstances under which they were made,

47

not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Wilmington Trust common stock during the Class Period.

87.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (a) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (b) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (c) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (d) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

88.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts. Defendants' material misrepresentations and/or omissions were done knowingly or with recklessly for the purpose and effect of concealing Wilmington Trust's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the

misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by recklessly refraining from taking those steps necessary to discover whether those statements were false or misleading.

89.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Wilmington Trust common stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Wilmington Trust's publicly-traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired Wilmington Trust common stock during the Class Period at artificially high prices and were damaged thereby.

90.     At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Wilmington Trust was experiencing, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their Wilmington Trust common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

91.     By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

92.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## SECOND CLAIM

### Violation Of Section 20(a) Of
### The Exchange Act Against Individual Defendants

93.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

94.     The Individual Defendants acted as controlling persons of Wilmington Trust within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

95.     In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

50

96.     As set forth above, Wilmington Trust and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**WHEREFORE**, plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.      Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 and any appropriate state law remedies to assure that the Class has an effective remedy; and

E.      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: November 19, 2010

**CHIMICLES & TIKELLIS LLP**

PAMELA S. TIKELLIS (#2172)
ROBERT J. KRINER (#2546)
A. ZACHARY NAYLOR (#4439)
222 Delaware Avenue, Suite 1100
P.O. Box 1035
Wilmington, DE 19801
Phone: (302) 656-2500
Fax: (302) 656-9053

KIM MILLER
**KAHN SWICK & FOTI, LLC**
500 Fifth Avenue, Ste. 1810
New York, NY 10110
Telephone: (212) 696-3730
Facsimile: (504) 455-1498
Email: kim.miller@ksfcounsel.com

LEWIS KAHN
**KAHN SWICK & FOTI, LLC**
206 Covington Street
Madisonville, Louisiana 70447
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
Email: lewis.kahn@ksfcounsel.com

CHARLES W. BRANHAM, III
HAMILTON LINDLEY
**GOLDFARB BRANHAM LLP**
2501 N. Harwood, Ste. 1801
Dallas, TX 75201
Telephone: 214-583-2233
Facsimile: 214-583-2234

**Attorneys for Plaintiff**